case of the day, which is 21-11-135, MSPA Claims 1 v. Tower Hill. We've got Mr. Zincone. I hope I'm pronouncing that right. If not, please correct me. And Mr. and Ms. Smith. Very good. Mr. Zincone, whenever you get settled in already. No hurry. May it please the Court. Good morning. Francesco Zincone here on behalf of the plaintiff, MSPA Claims 1, LLC. The government's cause of action under the MSP Act is nearly identical to the one designed for the recovery of Medicare dollars spent by Medicare payers that pay in the dark, as this Court has recognized numerous times over the course of the last 20 years. The government's cause of action is the most natural lender of the applicable statute of limitations as a result, and that statute of limitations triggered by actual notice and which places the control of the statute of limitations in the hands of the government, recognized by this Court as the party in sole control of the relevant information showing responsibility to pay, is essential to maintaining uniformity and serving the statute's structure and purpose. The record in this case makes that abundantly clear. The defendant, Tower Hill, which is a liability homeowner's insurer, admits that it settled a Medicare beneficiary's bodily injury claim and admits that it had primary payment responsibility to reimburse any Medicare payments that had been made as a result of that accident. It didn't. The record is clear on the matter. In fact, the defendants acknowledge that in their answer in affirmative defenses. Can I ask you just a question before we get too sort of deep down into the weeds of sort of when the three-year statute began to run? It seems like there's raging agreement now finally among the parties about which statute you ought to be borrowing, but I guess before we sort of get there, can you explain to me why it is that 1658 doesn't provide the relevant statute of limitations? I just don't think I understand why it doesn't. Yes, Your Honor, and with respect to 1658, 1658, the point of reference for section 1658 is whether or not the cause of action, the rights being asserted, arise under an act of Congress which postdated 1990. Right. Certainly, I recognize why this was raised by the court because Medicare Advantage, Medicare Part C, was first enacted, not first enacted, was enacted in 1997. As laid out in the supplemental briefing, a lot went on before 1990 which involved entities just like this. And so if we look at the case that the court pointed us to which is Donnelly from the Supreme Court, the language in the opinion lends itself in this particular instance to recognizing that the rights and liabilities that are concerned in the cause of action asserted in this case arose under acts of Congress which predated 1990. As laid out in our briefing, 1972 was the first time a Medicare substitute HMO came into being. Yes, I mean, I guess, and look, I'll confess to having been scarred by Donnelly because I argued part of it and lost it 9-0 in the Supreme Court, so I know all about it. And so as I, to my regret, read Donnelly again, it says if the plaintiff's claim that it arises under, if the plaintiff's claim against the defendant was made possible by a post-1990 enactment, and it just seems like, I mean, we've said, right, that the 1997 act created these MAOs. It created Medicare Advantage organizations, but Medicare Advantage organizations were a rebranding in 1997 of risk-bearing entities which had already been in existence really in this very form since 1982. At that point, the type of risk arrangement that a Medicare Advantage organization avails itself under and which was promoted and expanded by Medicare Part C had already been in place. So when you look at, we have made, understanding the made possible by language, I think it needs to also be read in connection with new rights and liabilities, which is also liabilities that are created by virtue of the subsequent act of Congress, which is also noted in Donnelly. And if you take those two and put them together, if we look at what is the right of action, the right of action here is an action to recover double damages with respect to Medicare payments that have not been reimbursed. The liabilities have been there, and the liabilities were there prior to 1990. It was nothing new. All the primary payers in this situation have always been expected to and should have already been on notice that they had an outstanding liability for any Medicare payments that were being made. And if you look at the actual MSP Act where the secondary payments are actually established in paragraph B, it states that these are all payments under the subchapter. That is exactly how this Court looked at, you know, analyzed that very provision when we were looking in Western Heritage and looking at whether or not Medicare Advantage organizations could bring this cause of action. It stated, the Court found that it was that provision that rendered all Medicare payments subject to reimbursement in these precise type of situations. So you have from 1970, 1980, an are subject to reimbursement by these very types of entities. Counsel, you talk about who has the knowledge of the information. You are insured, the S&E, S&R is insured knows about the payments. About which? I mean, they make the payments for the medical service, $8,000 or so, and they have an insured who has the money. All they are going to do is ask the insured. In this, we are looking I think at two different issues with respect to there. I am talking about who has access to the information. That there is a potential claim. And I had the same question. The MAO pays the insured's medical bills. That's correct. And the MAO knows at the time they paid the medical bills what they paid them for. It was for a fall. Okay. They know whatever. And you ask your insured. I get them all the time. I have fallen. And my insured sends me a form. Is there, it was at work. Was it you fall? Are you suing a third party? I mean, I get them any time you have to go to an emergency room. My blue cross blue shield insurer writes me as a federal judge. Hey, is there anybody you are making a claim against? Because they want to then give notice of a lien. That's how it's always worked. Now, I don't know about all this Medicare business, but every insurance company does that routinely. Which I don't understand why Medicare Advantage plans don't do that too. Particularly since they are supposed to be, try to go get back the government money for whoever I am suing. Why is that not the case here? With respect to just the last point that was made. It is incumbent upon primary plans to make sure that that money is being reimbursed. It is not. I am not getting to that yet. I am talking about who has the information to begin with and is the best person to provide the information in this system. Not what your legal liabilities are, but about payment. But who knows that the claim is being made, a liability or some of the claim. The insured knows, right? An insured would know to a certain extent, but the liability and the uninsured... And the insured and the person who pays the claim, i.e. this Florida MAO knows. I understand what your Honor is asking. I want to look at the anatomy of a claim from the start and understand the factual scenario here, which would have led to it. When you have a claim that is submitted to a Medicare Advantage organization, a Medicare Advantage organization like Blue Cross is receiving a claim from a provider for reimbursement of services. X-ray for broken bone. Correct. That is taking place before anything with respect to a claim has been lodged by a Medicare beneficiary against anyone. Yes, there was a slip and fall or yes, there was a car accident, but Medicare Advantage in this scenario is getting billed by a provider. That's being done in the dark. It's being done in the dark with respect to the situation and the circumstances of the underlying accident, slip and fall, which ultimately later on give rise to the liability under the Medicare Secondary Payer Act. Medicare Advantage, just like Medicare, gets a clean claim that is submitted. That's a claim that is facially sufficient. That's the same thing with Blue Cross Blue Shield works. They get a clean claim. They don't know. They just send out this form and say, because we want to subgrade if we can or we have a statute. If somebody else pays, they have a primary pay or whatever they call. It's paid within 30 days. Some may send those sorts of forms out in either the commercial or in the Medicare Advantage context. The way this statute and the regime that is set up by this statute, it recognizes that a primary plan is ultimately fully in control of all of the information regarding its own obligation to pay, how it is in fact primary to Medicare. All of that aside, under your interpretation of the limitations issue, there is absolutely no incentive whatsoever on the part of the party under C paying for the bills to ask their own client, have you gotten money from somebody else? Were you in an accident? Did you get an insurance company? So forth. No incentive at all. So if you treat this as a statute of repose in which the claim begins immediately, whether they know it or not, there's an incentive to make the inquiry. Do you agree with that? If you treat it like a statute of repose, you know what that is. That if you do that, then there's every incentive in the world for the party paying secondary pay or to make inquiry. Because it has the information. It has access to it. Power Hill didn't have any information about what was going on. They make a settlement. They make these filings in order to escape a penalty. And that's one of the reasons why these lawsuits are brought, for the penalty. Put it right on top of the table. To get the penalty. The penalty is there because this was not reimbursed in the first instance, as Tower Hill admits. That was there in the record. And this is a statute that is there to assess. From the point of view of just common sense, to have the payor have no incentive whatsoever to make an inquiry is silly in my view. It isn't. There is, however, an incentive for the secondary payor to inquire because it's unclear as to whether or not a secondary payor will ever come forward and actually make this happen. They can charge the clients by raising the rates. I mean, whatever. What we're looking at here, and I just want to be clear, is that this is a statute which was built in order to incentivize primary plans to come forward and make sure that these reimbursements take place. I respectfully disagree with Tower Hill. How many years could go by before you would be barred under your theory? Under our theory? How many years? Three years from the time that we receive notice that this settlement is taking place. Like I stated in my opening remarks, this is a very equitable statute of limitations under the circumstances it places the entire control over triggering the clock in the hand of the defendant which is settling the claim and has the beneficiary sitting at the settlement negotiation table with them. I see that I've exceeded my time. I would assume that people like Tower Hill, the insurance companies that file these notices, whether or not the party that they're settling with is entitled Medicare payments. No, they would be queried for it. They just file all of them. In this instance, they say that they file certainly all of their claims involving anybody who is Medicare eligible. Anybody they settle with of any given age, they're going to file. You agree? Well, nothing would get filed ultimately with Medicare unless the person comes back. Okay. Let's come back and figure out a subsequent report. Yes. Okay. Your client, or at least somebody along the chain of the process of whoever ended up being your client, gave notice of a lien though. It was just a lien. It was just too late. No, there was nothing too late about it because Tower Hill never came forward and notified anyone. Okay. Okay. But in 2014, your client did, they're in the dark, but yet they came and gave notice of a lien. They did. But only after they, here's the way that this took place, which is completely . . . Okay. It just goes to, as I understood the behavior of the person who first pays, they often try to find out if there's another. I know you dispute they have a duty to do that and that they don't have a duty to do that. They can sit back and wait until a settlement and then make the person who's paying notify them. But your client along the chain did give notice of a lien, right? They didn't know about the settlement. They didn't know about the settlement. Yeah. And so then Tower Hill writes back, oh, by the way, it's already been settled. And so you actually don't have a right to reimbursement. You don't have anything to give until the settlement has been reached. That's where the demonstration of responsibility actually takes place. So why did your client give notice of a lien? Because that's what I see in lawsuits, state court. I mean, there were liens. Every insurer gave notice of a lien. Every kind of personal injury case I have, because they want to get their money back. In 2015, MSP, the plaintiff here, after having done an extreme amount of investigation, which involved reaching out and requesting medical records. You gave notice of a lien in 2014. In 2015, those communications were taking place. It was ultimately in September of 2015. Why did MSPA give notice of a lien then? Because it sent a letter to the defendant in this case asking for information, any information at all regarding what might have happened. And then in response, a settlement was finally provided at that time. That's my whole point. You may still win on what you're saying, but that's my whole point. They sent notice to DL and said, look, what happened? MSPA, when they got it, because they know it's going to be that. So why couldn't the Florida Health, or whatever the name of it, has done that as a matter of course to begin with? Ultimately, this whole process involves reaching out, actually involving and querying third party, 30-party payment systems. And this is a somewhat, it's a more, I would say, novel. It's an innovation on the part of the particular plaintiff here. But remember, when we're talking about this case, we're talking about Florida Health Care Plus and the duties on Medicare Advantage. This applies to more than just the plaintiff in this particular action, which is what we understand. We understand that. That's why I said it's going to affect a lot of claims. They had no reason to do that. They had no reason to reach out and to Tower Hill one way or the other. In this instance, they had no notice of anything. They didn't receive the Medicare, they didn't receive any reports that were submitted to Medicare. But at some point, they found they had noticed to reach out to their insured, and that's how they found out about it. In this instance, no. It was only upon MSP doing this sort of investigation and scouring through Medicare medical codes and then reaching out to providers where this one was identified. And so imagine all the others that are not identified by virtue of the very policy for not coordinating with Medicare Advantage that was admitted by the defendant in this action. So your accrual rule, forget about what period of time. Your accrual rule would be when somebody pays, when Tower Hill pays the settlement. Because to show by this question, that litigation could have gone on for 20 years, right, before they paid anything. If the litigation goes on for 20 years, well then, there isn't a demonstrated responsibility to pay until... Until they settle. Until the settlement has been reached. That's what the statute says. And then what do we do when there's a settlement like this one that says we just released, it doesn't really say, it does release medical claims, but it doesn't write down the settlement. We don't know what the settlement was for. Only if it's, this has been, it's a separate issue than what's before the court in this particular instance. But the Medicare manuals and the case law gives guidance on that. What is that issue? Is the entire amount, if it ultimately was included within the claim, there is a claim for bodily injuries. Because the defendant has every opportunity at that time to make sure that whatever the lien is going to be is obtained and satisfied. But the problem is, the problem is the insurer doesn't know, maybe the lawyers should know, when they're settling this lawsuit just for $25,000 with Tower Hill, that there's been no notice of a claim for reimbursement to the medical. They don't know how to structure the settlement. They don't know, you know, to kind of say this covers pain and suffering, it doesn't cover medical expenses. That's what some of them do. But that's exactly why the statute is there in the first place, to make sure that that is obtained and investigated at the time that they're crafting the settlement. But the statute of limitations doesn't begin to run until Tower Hill pays. And Tower Hill, I assume, cannot be a primary payer until they pay. I mean, they're not a primary payer. That is absolutely correct, that they are not yet a primary payer with demonstrated responsibility to pay under the statute until the time that they enter the settlement and pay the settlement. Yeah. That is separate and apart from when the statute of limitations is going to be triggered. They have to then go forward in order to trigger this running of the statute of limitations and they have every opportunity to do so. They have to discern who the coverage is, whether it's original Medicare or whether or not it's Medicare Advantage. And it's as easy as sending a letter. And plaintiff's attorneys, personal injury attorneys. But basically, Tower Hill has all the responsibility here to make sure the Medicare Advantage plan, who's already paid, gets their money back. That's basically what it is. Tower Hill, who's not affiliated with Medicare, has nothing to do with it. Tower Hill's got all the... That's part of the standard business. The same way it's had to make sure that original Medicare liens are satisfied, it has an obligation that's been recognized by this court and is recognized by Congress, that they have to go out and reimburse Medicare Advantage the same way. These are Medicare trust fund dollars and they have a benefit. They provide a direct benefit to the trust fund and to the government. You know, some of us might think because Medicare Advantage plans are getting so much money, they might have a little role themselves to try to recover some of it themselves by paying another insurer. I mean, just might maybe since Florida Health Medicare plan is getting all these trust fund dollars, maybe they should do a little something to try to find out if there's a liability claim. But maybe I'm just naive about that. You're good. Okay. It's all good. You have your five minutes remaining. Ms. Smith? Nicole Smith. May it please the court, on behalf of Tower Hill, we ask that this court affirm the lower court order and find that MSPA's claim is barred under any of the available statutes of limitations. And I want to get right into answering the panel's questions and clarify some of the record if I could. Here, Tower Hill did report, Tower Hill reported immediately after it settled this claim, DL Hill was injured, allegedly a dog ran out of Tower Hill's insured house and either bit her or knocked her over somehow and she suffered injuries. That injury took place in March of 2012. Tower Hill did what it was supposed to do. It immediately settled the case on behalf of its insured and it reported the case pursuant to its Section 111 obligations. And that is in the record, there's a declaration from Angela Cole. Those are the documents in support of Tower Hill's motion for summary judgment. Angela Cole's declaration says that pursuant to Section 111 requirements, that information was transmitted to CMS in the next quarterly report. So that's how the 1395YB8 reporting requirements work. They're on a quarterly basis. So to understand the chronology, the incident takes place in March, Tower Hill settles in June, and Tower Hill's particular quarterly program works so that the next quarterly report to CMS is transmitted the first week of September of 2012. So as of that first week of September 2012, this plaintiff's assignor, the MAO, Florida So that is where we have the demonstrated responsibility. In a settlement case, the way that the primary plan indicates that it has entered into one of these settlements is something called TPOC. It is a one-time report, total payment obligation on behalf of the claimant. So that is now in the Section 111 CMS database. We know that this particular plaintiff, and many others out in the world, have access to this Section 111 reporting information. We believe we have plenty of... By this particular plaintiff, do you mean MSPA or its assignor? It's Florida Health. Actually, I mean both, to be clear. Everybody does. Everybody does. So what it's... They're just an assignee. They're assignors. Two or three back, however far you go, all of them, they all have the information, as I understand, and have that same information. Absolutely, and that's in the record, Judge Joflat. They're 30... I mean, they have constructive knowledge of whether they look there or not. You are correct, Judge. And in this record, the panel can rely upon the plaintiff's 30B6 representative, Natasha Blanco. In her deposition, she testified that MSPA claims was trying out these different CMS authorized portals, data handlers. They're called different names. At the time that they were doing it, she said there were about nine of them out there, and this was a direct distribution of data. If you could have... If you signed up for a subscription, you had access to this Section 111 reporting information. So we know from Ms. Blanco's deposition that they were trying them out, and back in 2015, they had access, meaning the plaintiff had access to this information. We know also from the complaint, because they attached a printout... Well, they got access because of the assignment, I take it. Perhaps. Before that, they had no interest. Well, right. There would be no connection otherwise to the primary payment. I don't know why you would want access unless you were trying to make some kind of a claim. Everybody else down the line had access. Right. And most importantly... Once they had the claim. Once they had the claim. And most importantly here is that FHCP, the MAO, undoubtedly has access to that data as well. Whether you believe there's enough in the record, we believe there is. Our district court judge didn't make a finding on this, but we believe upon a de novo review, this court can find that the data use attestation form that we submitted, we received from a subpoena from the receiver here, because FHCP actually went into receivership. And every MAO has one of these data use attestation forms that says CMS is giving you MAO access to this data. The benefits of... There's a lot of acronyms here. Let me make sure I got it right. We call it the Section 111, but the BCRC, the Benefits Coordination and Recovery Center, all of their data, these MAOs have access to it. And they clearly did here, undoubtedly pursuant to the testimony of their own representative and pursuant to the attachment, which is just one of many of these CMS sanctioned portals where somebody down the line can gain access. So to Judge Hall's point, there are other ways that MAOs can, or their assignees in this case, can gain access to this relevant information. We believe the most important way is through the Section 111 reporting information, because as Judge Joflat noted, we reported... We wanted to avoid a penalty. The information's out there. We wanted to protect our insured. We moved quickly. We paid. We reported as we should. So here... The filing, as I understand it, under the scheme, is made whether or not the insurance company believes this person is covered by Medicare. That's correct. It gets out of self-survival to avoid the penalty. That's correct. And to be clear, this is a settlement case. So that is where we have the, what I call the TPOC. There's different types of reporting that a primary payer, a potential primary payer, is obligated to make. For example, in a no-fault case, there's something called ORM, ongoing responsibility for medicals. So that's in the case of a MedPay or PIP, they get the claim in, they have a report that they file that says, hey, I think we might be responsible here for medicals. And so that puts the MAO, or traditional Medicare, on notice that there might be another primary payer out there. And then there's a second report that the primary payer has to do in the no-fault situation, which is the termination of ORM, which is... But let's assume that they saw the notice, and you want, I assume, the cruel of the cause of action to be from that notice. Yes, Your Honor, if this court determines that the appropriate statute of limitations to borrow is from 1395YB... Whatever the appropriate statute of limitations is, you think that they were given, should be from the time Taylor Hill gives notice, does the certificate, they can know that there's some third party who's become a primary payer that they can try to seek recoupment for, recovery from. If this court adopts 1395YB, yes, Your Honor. However, Judge Hull, I would also note that if the court, alternatively, as Judge Newsom noted, wants to adopt Section 1658, or even the four-year state law, 95.11, under either of those, then the accrual would take place from the time of demonstrated responsibility,  so that would be the four-year statute of limitations, either under 1658 or 95.11.3. That is... The accrual is when the violation allegedly took place, and in the settlement context, that is the time of the demonstrated responsibility, here, in the Taylor Hill case, would be the settlement agreement itself, which is June 22nd, 2012. And so all of this about the certificate is just the demonstrated responsibility of 621, and yes, they could have found out from the certificate that there had been this payment, that you had become a primary payer. That is one of the many ways that they could have found out. Let's assume you've already settled, and you've given the plaintiff the money, and then you file the certificate. Let's assume they sued in 21, and it was timely, under whatever statute of limitations. What happens then? Then the claim would not be barred, but we would still have other defenses. Yes, that's what I'm saying. What would your defense be then, because you've already paid the money to the insured, I mean, to the plaintiff. What happens then? Sure. So under that scenario, again, assuming it's timely, and they sued within whatever the applicable statute of limitations is, we would still have some defenses as to standing, as to the particular here plaintiff. We would have defenses as to, in any Medicare conditional payment scenario. Suppose it was no receivership, and it was the Florida MAO, was a plaintiff. Or even traditional Medicare, Judge Hull, there's always going to be defenses to make sure that the particular payment that was made, by whether it be Medicare or the MAO, is actually related to the underlying settlement at issue. So you have this scenario of this lady's glaucoma is being claimed, and Medicare wants to collect for a payment they made for her glaucoma, but she injured her ankle here. Right. So there's still various defenses that can be brought up, but as to the statute of limitations, which is at issue here, Judge Hull, we believe under any of the proposed statute of limitations, that the plaintiff's claim is undoubtedly barred. And under none of these statute of limitations should this court graft a discovery rule to it. I think that the Foudy decision is very clear on that, and the United States Supreme Court, Florida Supreme Court, all courts hold that the general rule is that the cause of action should accrue when the last element takes place, here when the violation takes place, unless there's some sort of act of concealment where we're going to actually graft that kind of rule, that discovery rule on there. Here as our learned district court judge noted, there might be some lack of information within the MSP statutory scheme, but this is not a cause of action based on fraud. It's very different as compared to, for example, the False Claims Act, where there's information that is purposely being concealed. There was no information here that was being . . . There's no fraud theory you could make out of something like this, I think, in my view. No, Judge Toflat, there is not. And their theory of trying to also re-in the word actual notice into if this court decides to accept the governmental three-year cause of action is also completely impermissible. This court shouldn't write in words. I don't think you could allege fraud in keeping with Rule 11 of the civil rules. Yes, Your Honor. That would be a frivolous . . . Especially somebody far removed from the transaction in the first place. Right. An acide down the line of the claim . . . Yes, Judge Toflat. Would have a terrible time proving fraud . . . Absolutely. . . . on that acide. Absolutely, and any difficulties down the line from a chain of assignment clearly shouldn't start the clock anew. That would be . . . What do you contend the statute of limitations should be then? So, Tower Hill posits that the appropriate statute of limitations is the three-year governmental statute of limitations. However, not grafting onto an actual notice or requiring something more than 1395YB actually requires. All 1395YB requires is that CMS receive . . . It is the receipt of notice of the settlement agreement. There is no requirement under the federal government statute of limitations provision that it can only be triggered when the primary payer actually sends the settlement agreement itself. That's not how it works. We're not uploading settlement agreements. We're filing these TPOC reports, these ORM reports, all of these reports, but there's no actual settlement agreement that is being provided. However, alternatively, if this court believes that 1658 or the Florida four-year statute of limitations found in 95.11 is more appropriate under Del Costello, you know, state law should be the first resort. However, here we do believe that the more suitable and analogous statute of limitations can be found in the Medicare Secondary Payer Act itself. However, if either 1658 or the four-year Florida state law applies, again, it would be triggered from the date of violation here, which is the settlement agreement itself. Has any of the circuit addressed this statute of limitations issue? I see I'm over my time. Please continue. So, no, not as to the applicability to an MAO. We do have the farmer's case, which was just a district court in the central district of California, which did apply the three-year governmental statute of limitations. Again, it was in the context of a discovery dispute trying to define, you know, what records. And does Tower Hill, if you know, get notice of liens a lot of times still, or is that I mean, because everybody's got health care. I mean, so normally it's just the health care, MAO or Blue Cross. You're a liability carrier. You may be a medical carrier too, but you're a liability carrier. Do liabilities companies routinely now get notice of liens still, or do you know? I don't know. I know with this particular plaintiff's group, liability carriers had been receiving many lien letters. However, I can't say if it's with more or less frequency today. Yeah, very well. Thank you very much, Ms. Smith. Mr. Zincone, you've got five minutes remaining. Thank you. Taking up some of the points that have been raised, and notice by access seems to have been prominently featured both in the defendant's arguments and in the questioning from the court. This is one instance where the district court actually got this correct in applying. If we are to apply the three-year statute of limitations and borrow that over to the private cause of action, the district court was clear on its interpretation of the language in the statute. Notice by access is not at all, is not what was required. In fact, it states Tower Hill's notice by access argument hardly amounts to the quote receipt of notice. The provision contemplates receipt has real meaning here, and it implies that something has been provided to either Medicare, if Medicare is the party that has ultimately been responsible and is entitled to reimbursement, or Medicare Advantage in the instance of this case. In fact, with respect to whether or not Florida Healthcare Plus might have had access to these reports or access to the Medicare data, there is absolutely no substantial competent evidence in the record to suggest that Florida Healthcare Plus received these reports at all. And in fact, in Judge Chilflatt's dissent in 2018 regarding the request for en banc hearing, rehearing of Western Heritage, Your Honor noted in one of the footnotes that in primary payers in these cases and in other commentary, Jennifer Jordan had issued an article which you cited which stated that Medicare Advantage organizations were not receiving the reports that were being transmitted by defendant primary payers to Medicare. There is nothing in the record here to suggest that anything like that took place. There is nothing to suggest that Florida Healthcare Plus received that, and there is everything to suggest that Tower Hill did absolutely nothing to go to Florida Healthcare Plus or the plaintiff and notify either one of them that they had an obligation to pay here. We talk about the distance from the transaction in question. The real transaction that gives rise to the payment obligation is the settlement by the defendant of the underlying, of the bodily injury claim that has been raised. It's the defendant at that moment, which in Western Heritage and in Baxter, this court recognized is on constructive notice that Medicare has made payments or Medicare Advantage has made payments that need to be reimbursed. In fact, in Baxter, the court said that at this point, reviewing the entire structure put in place by the MSP Act, it can be read to suggest nothing but that a primary plan that is settling a bodily injury claim has constructive notice of the payments owed, and at that point has a- Is your argument that the primary carrier has to seek out Medicare? Yes. The primary- On its own? No, liability is one thing. They have a duty to go knock on the door and tell them we've made a payment. That's correct. What's your best case for that proposition? Baxter. Baxter and Western Heritage. It states that that's when their reimbursement obligation is triggered. I'm not talking about the reimbursement obligation. I'm talking about the duty to do something else. It stated, it was just stated in 2020 in ACE where the court referenced the reports that are being- We should write an opinion in which we say that the primary carrier has an obligation to go ferret out the payor, the secondary payer. To do it at its own risk, and if it never- Sorry. If it never finds the secondary payer, it's still liable indefinitely. Maybe there's a statute- Well, there's no statute of limitations on its obligation is what I'm trying to tell you. Under your argument, as I hear your argument. There is a statute of limitations that's applicable, and it runs- Oh no, if they have an obligation to go knock on the door, the question then becomes, when does that obligation end? Their obligation is, it ends upon sending, putting the- No, no, no, no, they got to go knock. They haven't knocked on the door. Now, when is the obligation of not knocking on the door end? They haven't put it in our mailbox, I would say, is really what this is requiring. It needs to be received. He's saying, when does the obligation of not, when their obligation of putting in your mailbox, when does that end? It never ends. There are many statutes of repose that, but that's not what really is at issue in this case. I think there's a statute of repose, or it must be, or it never ends. Under the faults in Manning, when the court was considering, I believe- Will you agree with that? It never ends without a statute of repose. Without a statute of repose, it would go on, but that's why- Never. Not necessarily. Tower Hill would be liable as long as we're around here, until it goes to the secondary payer. Do you agree? That's all it has to do. All it has to do is ask the Medicare beneficiary to settle with. I understand the question, but it's not an insurmountable- We're having a good time here. We're just disagreeing on two things. You're talking about liability, and I'm talking about another duty, an obligation to go tell them. They go hand in hand because the obligation, it's not about liability under this cause of action. It's about the fact that this statute contemplates that the primary plan is going to come forward and pay on its own initiative. Certainly, if it's going to pay and do so without litigation and without notice from Medicare, that's what the court said in ACE, and that's what this statute sets out. If it's going to do that, it has to come forward and give notice. It has to knock on their door and say, what is the lien amount I'm ready to pay? Otherwise, if it didn't come forward and make some sort of effort, all it takes is a letter that sent out of the court after the defendant in this case settling the claim. Just like the defendant did, or the primary plan did in Western Heritage, sitting at the table and asking the beneficiary. It's not about whether or not Medicare Advantage does or does not go out and ask the beneficiary. It could, and it certainly has an incentive to recover as much money as it possibly can, but it's important to make sure that it recovers all of them, and that's exactly what should be going to Medicare as well. And in order for that to happen, it has to be being done by the party that is in the best position, the second payer, and has all of the information right there in front of it, and access all of it to take the affirmative effort to do it. That's what the statute sets forward. It's not about whether or not Medicare Advantage really did anything. It's not about whether or not Medicare... Yeah, because they don't... The second payer doesn't become the second payer until they pay. Until they pay, and so with... They're just a potential liability second payer. I have this question. 20 minutes. I think Judge Hall has one more question. Without regard to whether this makes any difference or not, just a record question. Is she correct that the CMS system, which has these QALY certificates, is accessible by MAOs? There is... It's completely absent from the record. It's absent from the record. There is... The only thing that was provided in the record is a form attestation, which basically says that there is some level of access, but there is nothing in the record from FHCP, and certainly nothing from the plaintiff's side. While I'm asking about it, we could always say that's something that needs to be answered before we'd say anything, so it's very important to me, so let's go to it, because you know the answer to it, so just tell me what the answer is. Not in the record, but there's a CMS... Let me break it down. Do they have to file a certificate? Does Tower Hill have to file something in the system when they pay? They have to file something in the system when they pay. I want to just be clear about what they have to do. Just the same way that defense counsel raised, they have to file... Quarterly. Quarterly, but it has to be specifics of the settlement sufficient that Medicare has actually received... Okay, and we don't know because we don't have what they file, so I understand that, but they're supposed to put in the CMS system that they've paid on this, okay? The amount, the date of the settlement, the date of the loss, the underlying Medicare beneficiary, a lot of the information regarding the... Do they say the name of the MAO? No, they would not say the name of the Medicare Advantage Organization. But they would say the Medicare beneficiary and some identifying... A Medicare number, probably. In order to report, they have to have the individual Social Security number, so that's the way they are reporting this information to the Center for Medicare. Okay, so the settlements in the CMS system, and my question is, does the MAO by subscription or otherwise have access to that? I'm not seeing it happen in this case. There's no record evidence. There's no record that FHCP did. I know, I know, but do MAOs generally have access to that CMS information? It varies across the board, and it also varies very much over time. In this instance, we're looking at a claim which was back in 2012. It may very well be that in a different case, on a different record, that Medicare Advantage Organization, not FHCP, was receiving regularly... Okay, you've answered my question. Thank you very much. So there is that, but in order for the... And I think we've conceded this point because it was one that was written in our reply brief, that you weren't saying that if there was record evidence to suggest that the Medicare Advantage Organization or the plaintiff actually received, in this instance, received a notice that it had been received... Tell me what statute or regulation has the item receipt of notice. I've gotten so confused here. Receipt of notice is expressly stated at 1395 Y... Okay. That's the government cause of action, right? B2, B3, B4... Okay, just the government cause of action said. I thought it was the last couple sentences of the government cause of action. Okay, thank you. Very well. Thank you both very much. We'll be in recess until tomorrow at 9 o'clock. That case is submitted. And can you compare me to that on the book?